UNITED STATES FIDELITY AND GUARANTY COMPANY, Plaintiff and Counterdefendant, v. AMANDA J. CRAIL, a Minor, *et al.*, Defendants (Mildred Wells, Defendant and Counterplaintiff-Appellee; Country Mutual Insurance Company, Defendant-Appellant).—UNITED STATES FIDELITY AND GUARANTY COMPANY, Plaintiff and Counterdefendant-Appellee, v. AMANDA J. CRAIL, a Minor, *et al.*, Defendants (Mildred Wells, Defendant and Counterplaintiff-Appellant; Country Mutual Insurance Company, Defendant).

Fourth District    Nos. 4—93—0252, 4—93—0318 cons.

Argued August 24, 1993.—Opinion filed December 22, 1993.—Modified on denial of rehearing March 2, 1994.

Karen L. Kendall and Bradley S. McMillan (argued), both of Heyl, Royster, Voelker & Allen, of Peoria, and Frederick P. Velde and Daniel R. Simmons, both of Heyl, Royster, Voelker & Allen, of Springfield, for appellant Country Mutual Insurance Company.

Gregory A. Cerulo and Mary W. McDade, both of Quinn, Johnston, Henderson & Pretorius, of Peoria, for appellee United States Fidelity and Guaranty Company.

Eldon H. Becker (argued), of Grosboll, Becker, Tice & Smith, of Petersburg, for Mildred Wells.

JUSTICE GREEN delivered the opinion of the court:

On June 3, 1991, United States Fidelity and Guaranty Company (USF&G) filed a complaint for declaratory judgment in the circuit court of Sangamon County against Amanda Crail, Country Mutual Insurance Company (Country Mutual), and Mildred Wells. The complaint sought an order declaring that USF&G had no duty to defend or indemnify Amanda Crail, under a commercial insurance policy it had issued to Treasure Island Used Cars, for any claims presented by Mildred Wells arising from an automobile collision on March 3, 1990. On July 18, 1991, Mildred Wells filed a countercomplaint for declaratory judgment against Country Mutual and USF&G seeking to have an order requiring Country Mutual to provide insurance coverage pursuant to a policy of automobile insurance issued to Amanda Crail's parents, Fred and Mary Jo Leeds, and requiring USF&G to provide insurance coverage pursuant to a policy of insurance issued to Treasure Island Used Cars.

On August 26, 1992, the circuit court entered an order granting summary judgment in favor of USF&G and against Amanda Crail, Country Mutual, and Mildred Wells allowing USF&G's complaint for declaratory judgment, finding it had no duty to defend or indemnify Amanda Crail. Mildred Wells filed a separate notice of appeal from this judgment (our case No. 4—93—0318).

Following a bench trial, the circuit court entered an order on February 23, 1993, allowing Mildred Wells' countercomplaint and finding that Country Mutual was obligated to provide coverage to Amanda Crail in regard to the collision involved here under a policy

issued to her parents which had limits of $500,000 per occurrence and $250,000 per person ($250,000 policy). Country Mutual has appealed contending that its liability insurance policy issued to the Leedses, having a $25,000 limit ($25,000 policy) in regard to liability to one person and $50,000 for each occurrence, was applicable to any liability of Amanda to Wells arising from the collision but that the $250,000 policy did not cover the collision (our case No. 4—93—0252).

The two appeals have been consolidated. We affirm the judgment for USF&G in case No. 4—93—0318. We vacate the judgment in case No. 4—93—0252 and remand for reconsideration by the circuit court.

■ The issues in case No. 4—93—0318 are not complicated. Undisputedly, at the time of the collision, Amanda was driving a 1981 Chevrolet pickup truck which had been owned by Bill Fuqua, a used car dealer doing business as Treasure Island Used Cars, and who had a policy of liability insurance issued by defendant USF&G. As we later explain, a dispute existed as to whether, at the time of the collision, the Chevrolet pickup truck was owned by Treasure Island Used Cars or by Amanda's stepfather, Fred Leeds. USF&G contends it was entitled to a declaration that it had no responsibility to defend or indemnify Amanda, because (1) ownership of the pickup truck had passed to Fred Leeds before the collision, and (2) in any event, the USF&G policy issued to Treasure Island Used Cars states that a "customer" who is driving a vehicle owned by the insured is covered but only to the extent that driver does not have automobile or liability insurance to the limits set by the "compulsory or financial responsibility law limits" in force where the used vehicle "is principally garaged."

Clearly, the pickup truck was entirely garaged in Illinois. At all times pertinent, section 7—601(a) of the Illinois Vehicle Code (Code) (Ill. Rev. Stat. 1989, ch. 95$\frac{1}{2}$, par. 7—601(a)) has provided that owners of motor vehicles of the type of the pickup truck here shall acquire liability insurance covering that vehicle in an amount no less than the amount of security required by section 7—203 of the Code. (Ill. Rev. Stat. 1989, ch. 95$\frac{1}{2}$, par. 7—203.) At all times pertinent, section 7—203 of the Code has required that security furnished pursuant thereto shall be in the amount of not less than $20,000 for the death or injury to "any one person in any one motor vehicle accident" (Ill. Rev. Stat. 1989, ch. 95$\frac{1}{2}$, par. 7—203). At the time the summary judgment was entered for USF&G, Country Mutual had admitted that Amanda had available liability insurance in the sum of $25,000 for liability to one person arising from one accident. Thus, USF&G was entitled to a summary judgment on the basis of the existence of the $25,000 policy, regardless of where the ownership of the pickup

truck may be. The summary judgment for USF&G must be affirmed in case No. 4—93—0318.

■ Consideration of greater details are necessary in order to reach a decision in case No. 4—93—0252. The following facts concerning the $250,000 policy, upon which Wells seeks coverage, are not disputed: (1) it covered a 1985 GMC vehicle owned by Fred and Mary Jo Leeds and was in force at the time of the collision; (2) it also provided coverage for "nonowned" vehicles for the named insured and "relatives" of the named insured; (3) in regard to an insured vehicle, coverage was provided to the named insureds, residents of their household, and those using the vehicle with the permission of the insureds or an adult relative; (4) a "nonowned vehicle" was defined as one not owned by the insureds or their relatives "and *** not available for regular use by [an insured] or [an insured's] relative"; and (5) the term "relative" was defined as "a person related to [the insureds] by blood, marriage or adoption who is a resident of the same household as [the insureds]."

In its petition for rehearing, Country Mutual requested the circuit court to explain its ruling. The court then explained that it concluded that even if title of the 1981 Chevrolet pickup truck had passed from Treasure Island Used Cars at the time of the collision, Amanda's sister, Trina L. Crail, was the actual owner, because Fred Leeds had testified he was purchasing the vehicle for her use. The court then determined that the vehicle became a "nonowned vehicle" within the meaning of the $250,000 policy and thus gave coverage to Amanda as she drove it. The court's reasoning was flawed because, under the terms of the policy, the availability of the vehicle for regular use by Amanda, a relative of the insureds, and Trina and living in their same household, would prevent the vehicle from being "nonowned" under the terms of the policy even if title had passed from Treasure Island Used Cars at the time of the collision.

The evidence at trial concerning the ownership of the 1981 Chevrolet pickup truck consisted entirely of the testimony of Fred Leeds and exhibits consisting of documents concerning the sale of the vehicle to the Leedses. The Leedses had owned a Pontiac "Trans Am," which had been the named vehicle for the $25,000 policy. Fred Leeds testified he had been looking for a different vehicle, and a friend in Charleston, Bill Fuqua, who sold automobiles, had let him use the Chevrolet pickup truck which was later driven by Amanda at the time of the collision. Fred further stated that he and Fuqua had arrived at an agreement for him to trade the Trans Am for the pickup truck with him paying an additional sum of money. Then, on March 3, 1990, the day of the collision, he was in Casey with Fuqua to

complete the paperwork on the sale. According to Fred, just before the closing papers were executed, he telephoned his home and was told of the collision. He admitted that he and Fuqua then executed the necessary papers and signed them but dated them as being executed on the previous day, March 2, 1990. Based upon these documents, a certificate of title was issued to the Leedses stating a March 2, 1990, date of sale of the vehicle.

In arguing that the Leedses were the owners of the Chevrolet at the time of the collision, Country Mutual places substantial reliance on the rule that a rebuttable presumption exists that the date of sale shown upon a certificate of title to an automobile is the actual date of the sale. (*Pekin Insurance Co. v. U.S. Credit Funding, Ltd.* (1991), 212 Ill. App. 3d 673, 571 N.E.2d 769.) Here, the testimony that the various documents were inaccurately dated and that the parties had previously decided upon the terms of the transaction before March 3, 1990, created a question of fact for the trier of fact as to who owned the Chevrolet pickup truck on the day of the collision. See *Sheary v. State Farm Mutual Automobile Insurance Co.* (1991), 207 Ill. App. 3d 1067, 566 N.E.2d 794.

We do not agree with Country Mutual's contention that even if ownership of the pickup truck was retained by Treasure Island Used Cars at the time of the collision, the vehicle would not be "nonowned" within the meaning of the $250,000 policy because it was "available for regular use" by Amanda. The undisputed testimony of Fred Leeds was that the pickup truck was placed in possession of him and his family for use for a short period to determine whether they wished to purchase it. The fact that it would be used regularly by the Leeds family after sale would not make any presale possession "regular use."

The question of whether the ownership of the 1981 Chevrolet pickup truck had passed from Treasure Island Used Cars at the time of the collision under the law applicable to insurance policies is a question of fact for the trier of fact which must be decided upon rehearing.

Country Mutual admits that at the time of the collision the $250,000 insurance policy contained an endorsement referred to as a "NIECE" which is an abbreviation for the phrase "Names Insured Extension of Coverage Endorsement." This document contained language as follows:

"NAMED INSURED EXTENSION OF COVERAGE
ENDORSEMENT

If you have paid the additional premium (see the declarations page), it is agreed that the definition of nonowned vehicle, *as it*

*affects you* under Section 1 of the Auto Insurance Policy, is modified to read:

Nonowned vehicle in Section 1, 2, and 3 refers to a land motor vehicle you or your relatives do not own and which is not available for regular use by you or a relative. However, in Section 1 only, *a nonowned vehicle includes a motor vehicle, covered by bodily injury liability insurance, which is owned by you or your dependent relative and furnished for the regular use of your dependent relative.*

Nothing contained here varies, alters, or extends any provision of your Auto Insurance Policy except as provided in this endorsement." (Emphasis added.)

Country Mutual points out that the endorsement in regard to definition of a "nonowned vehicle" is modified only "as it affects you." Country Mutual then explains that the policy defines the words "you," "your," and "yourself" as "the person named as insured on the declarations page of [the] policy and that person's spouse, if a resident of the same household." The policy lists Fred and Mary Jo Leeds as the insureds. Thus, according to Country Mutual, Amanda Crail does not obtain any additional coverage by virtue of the "NIECE" as she is not a "you" within the meaning of the $250,000 policy.

In *Prudential Property & Casualty Insurance Co. v. Scott* (1987), 161 Ill. App. 3d 372, 377-79, 514 N.E.2d 595, 598-99, an automobile liability insurance policy's definition provisions stated that the word "you" referred to the named insured. This court held that the reference to "you" in a family exclusion provision of the policy referred only to the named insured and not the designated driver of the vehicle who was not a named insured. Consistent with this court's holding in *Scott,* we conclude that the modification brought about by the NIECE here affects only the Leedses and not Amanda Crail for whom Wells seeks coverage on the $250,000 policy.

Wells also contends that a Country Mutual agent bound it to coverage on the instant collision. This assertion is based on the testimony of the only two witnesses to testify at trial, Fred Leeds and Elson Gourley, a "captive" agent of Country Mutual. A "captive" agent of an insurance company is one who sells no other line of insurance than that of his principal. Country Mutual does not dispute that Gourley had authority to bind it here. Leeds testified that when he talked with Gourley about the issuance of the $250,000 policy which was then to cover the Pontiac automobile, discussions were as follows:

"Well, I had discussed with Mr. Gourley how much insurance that

we should have on that particular vehicle, and at the time it was—he told me that I could get the minimum amounts on that vehicle because it would be covered under the larger policy which I held on the GMC which was Exhibit—Plaintiff's Exhibit 3 that you showed me."

Country Mutual admits that the 1981 Chevrolet pickup was a replacement for the Pontiac Trans Am and covered by the $25,000 policy.

In Gourley's testimony, he admitted that he understood that Amanda and Trina would be using the GMC vehicle insured under the $250,000 policy, and that Amanda was listed as an occasional driver on that policy. The colloquy which took place thereafter was as follows:

"Q. [Wells' attorney, Becker:] Now when you were told that Amanda was going to be driving Fred's automobile, did you have a—didn't you have a conversation with him whereby you told him that you would put Amanda on his policy and that way she'd be covered under his policy if she was involved in an accident?

A. [Gourley:] Okay. On Amanda, when she was put on as an occasional, *I'm not sure that that conversation took place.* It was the original—when Trina was put on originally, I think the conversation took place.

Q. Okay. So when Trina was put on, did you tell Fred that you'd cover her under the smaller policy and then if there was an accident, she would also have coverage under the larger policy?

A. Well, if he understood me to say that, *that wasn't really what I meant to say because we put a NIECE endorsement on the '85 GMC which means that if he or Mary Jo was driving the '80 Pontiac, then their coverage would follow them over to the vehicle.* But when Trina started driving, *if I gave him the impression that her rates were going to be twenty five and five hundred, I misled him.*

Q. And isn't it possible that you could have told him that, Eldon?

A. I don't think—

MR. SIMMONS [Counsel for Country Mutual]: I object—

THE COURT: Excuse me.

MR. SIMMONS: I object to the question, it asks for a possibility, not what happened. It's asking him to speculate.

THE COURT: Sustained.

MR. BECKER: Q. Didn't you tell Fred that the coverage would follow back to his policy so if she was in an accident that there would be 250,000 and $500,000 coverage?

A. Not when Trina started driving, I don't believe I did, sir.

Q. What about Amanda?

A. Not when she started driving. At the time of the accident, there may have been some reference to that.

Q. At the time of the accident, you were under the impression that there was $250,000 coverage as their agent with Country Companies, weren't you?

A. For whom, sir?

Q. For my client that was injured in this accident, that Amanda was driving the pickup truck.

A. *It was my understanding, and again, I knew that Trina was not covered for that, but in my opinion, other members of the family under that NIECE endorsement would have been covered for the two fifty.*" (Emphasis added.)

Nothing which Gourley testified to constituted a promise by him that the $250,000 policy would cover Amanda in the event she had a collision while driving the Pontiac (and, by substitution, the Chevrolet pickup truck). The language attributed to Gourley by Fred Leeds was closer to a promise of coverage. However, the promise was not of the temporary binder nature which courts have upheld in *Devers v. Prudential Property & Casualty Insurance Co.* (1980), 86 Ill. App. 3d 542, 408 N.E.2d 462, and *Gothberg v. Nemerovski* (1965), 58 Ill. App. 2d 372, 208 N.E.2d 12. Rather, Gourley's statement even as recited by Fred Leeds was basically an oral interpretation of the contract which cannot control over the express terms of an insurance policy. (See *Allstate Insurance Co. v. Conglis* (1961), 33 Ill. App. 2d 370, 179 N.E.2d 434.) Moreover, Gourley made claim in his testimony that he had stated that the NIECE gave no coverage to Amanda.

Accordingly, as we have indicated, we affirm the judgment in favor of USF&G in case No. 4—93—0318. We vacate the judgment in case No. 4—93—0252 and remand that cause to the circuit court of Sangamon County for further proceedings as directed.

No. 4—93—0252, Vacated and cause remanded with directions.
No. 4—93—0318, Affirmed.

KNECHT and COOK, JJ., concur.